Please file a case. Have a seat. Case number 11-3410, Conway Transportation Services v. Brian A. Hamer Please step up and identify yourselves. Fred Marcus on behalf of Conway. Laurel Wunder on behalf of the Department of Revenue. R.H., you know, generally we give you leeway if we ask a lot of questions, but don't go on forever. I do not plan to. Forever's a long time, though. Yes, it is. Good morning. May it please the Court? I'm here today on behalf of Conway Transportation Services, who's seeking a refund of corporate income taxes pursuant to the limited exception to what I will call the no-refund rule that's set out at 521.105L of the Department's Emergency Amiculative... Well, before you start again, counsel, could you please pay attention to this microphone? It does not amplify, but it does record. Okay. And we need you speaking into it. I will be more careful. Thank you. Thank you. As I indicated, I'm here today on behalf of Conway Transportation, who's seeking a refund of corporate income taxes pursuant to the limited exception to what I will refer to as the no-refund rule that's set out at 521.105L of the Department's Emergency Amnesty Regulations. And we're dealing with the 2003 amnesty, not this latest amnesty that we just experienced in 2010. I understand that. Thank you, counsel. And I would suggest that, unlike the path that the taxpayers followed in both the Metropolitan Life and Variant International cases, which have been decided by the appellate court and now are on their way to the Illinois Supreme Court, the taxpayer in this case did exactly what the department asked it to do in its emergency regulations. Now, the Department of Revenue's administrative law judge's recommendation for disposition, which was accepted by the director of the Department of Revenue, concluded that the taxpayer had failed to file its refund claim within three years of the date of the original return filing or within one year of the date that the amnesty payment was made. That's the statute of limitations that's found in Section 911A of the Illinois Income Tax Act. We do not dispute that. That is factually accurate. Before we do that, I think there's some dispute about the standard under which we should determine this case. And I was curious as to your position that it's a mixed question of fact and law when the facts really seem to be without any dispute. That's not our position. That's the state's position. Our position is de novo. I apologize. Not a problem. I'll ask her the same question. I was going to ask you why you were thinking it was de novo instead of a mixed question of law or fact based on whether the rule applied as to the established facts or it is or is not violated. Well, actually I prepared to address that. And initially what I'd like to say with all due respect is I don't really care. Because I think it should be a de novo review. But on the other hand, I believe that the Department's decision is clearly erroneous. But let me explain why I think it's a de novo review. Again, the Department characterizes this appeal as a mixed question of law and fact. And it concludes that the proper standard is clearly erroneous. We, as you might expect, believe that it's de novo. In its papers, the Department argues that in contrast to the question presented in the American Airlines case, which is the case that we've hung our head on, a case involving application of a statute of limitations, de novo review, what the Department says here, and I quote, the factual component here cannot be readily separated from the legal interpretation. The question here is whether the facts satisfy the statutory standard Conway invokes. Now, of course, we beg to differ. We think the rule of law is in dispute here. The issue before this court is the proper interpretation, or at least I believe the issue before this court, is the proper interpretation of the Illinois Income Tax Act Section 911Bs. So you're not questioning the facts. You're questioning just the application of the law to the facts. Well, what I'm suggesting is that what we're looking for here is an interpretation of 911B, that's the statute of limitations that applies to final federal changes, in light of the Department's rule and its emergency rules at 521.105.L. And what's happened here is the Department is saying that the limitation in 911B, which I will explain in detail, that the limitation in 911B is applicable here and that we did not meet it. And what I'm going to suggest is when you read 521.105.L, which I'll recite in detail for you, in conjunction with the statute of limitations at 911B, which is the statute of limitations pertaining to final federal changes, that we are entitled to our refund. We've met the conditions set forth for the limitation to not apply. Let me just ask this, if I can, Mr. Marcus. This isn't a circumstance where you're really looking for relief from what the IRS did. There was an initial underpayment or understatement, rather dramatic understatement, of income from the first return. And your client sought to take advantage of this amnesty program, which would relieve it of the obligations. And I can only presume that there was some indication that there was an audit coming or that there was some claim by the IRS at some point that there was an underreporting. But whether it's true or not, your client, in its view, had underreported its income for the taxable year, had not paid over a period of years the amount that it would have to pay if that underpayment was accurate, or excuse me, if underreporting was accurate, and sought to relieve itself of what would normally be statutory penalties and interest by taking advantage of this amnesty program. And made an estimate of what the underreporting was for purposes of the good faith requirement of the amnesty program. And that turned out to be either an overstatement of what that deficiency was in the reported income, or because of favorable negotiations with the Internal Revenue Service, and it really doesn't matter which of that it was, turned out to be, the good faith estimate turned out to be in excess of what the negotiated amount was with the Internal Revenue Service. So in this instance, the actual amount of income was in excess of the amount initially reported. And so the federal action didn't result in a refund being due on the taxes paid as a result of your first payment and your first reporting of income. You are seeking to apply this to a reduction in the amount that your good faith estimate was anticipating the amount to be. Isn't that correct? For the most part, yes, that is correct. And did you not, your estimate was pretty accurate, because actually you saved yourself $6,000 or $7,000 on the penalty, because had the penalty gone into effect, you would have paid like $48,000 more. Instead, you'd pay $41,000. And just looking at the semantics, I'm agreeing with him, saying you later figured more accurately. Well, we didn't figure anything. The Internal Revenue Service did that for us, but I agree with what you've said in principle. But let me correct a few things if I may. Please. When the amnesty program began in November of 2003, the taxpayer was already under audit by the Internal Revenue Service. And what the emergency rules of the amnesty program and the emergency rules were designed to do was to entice a taxpayer who was under audit by the Internal Revenue Service, but yet not had a final determination, to make a good faith estimate of what it believed the final federal taxable income would be for the taxable year. In this case, it's the 1997 tax year. And the reason for that is because the legislature and the department were trying to encourage money. And what the department said in its emergency rules at 521-105-L was make a good faith estimate, file your return, pay the additional tax, and then when the Internal Revenue Service's audit is final and you have a final determination, if that final determination results in less tax than you estimated, then you will get a refund. Well, that, I understand, is your position, Mr. Marcus. The problem is, as often is the problem as we look at things, is that literally it doesn't say that. And the question before this Court, as I see it, is whether it means that or not. Well, but I think the rule does say that. And let me quote from the rule. It says, and again, this is 525-105-L, for purposes of participating in the amnesty program only, so it's limited to the amnesty program, a taxpayer may file an amended return reporting a federal change prior to receiving final notification from the Internal Revenue Service that the change has occurred. Although participants in the amnesty program may not seek refunds, a limited exception to the rule will be permitted for taxpayers whose refund claims are based upon final determinations of the Internal Revenue Service or the federal courts. That's what the rule says. And the way that I interpret that rule, and the way I would hope this Court would look at the rule, is that the taxpayer here was invited, granted, in order to avoid double interest and penalties. No question about that. To a voluntary program. I would not characterize the program as voluntary. When you have double interest and penalties hanging over your head, which can be very significant, you have a sledgehammer hanging over your head. So I question how voluntary the program really was. And you can see what's happened in the Marriott and the MetLife cases. They chose not to participate. They were in the midst of a federal audit or had a federal audit that began after amnesty closed, and now they've paid the additional tax and they've been assessed double interest and penalties. And again, that's what the program was designed to avoid. It was designed to encourage you to make a payment, but if you were wrong, it was going to provide a refund. And I would also suggest that on the flip side of this coin, if we had made an estimate, and let me just throw some numbers out as an example. Let's assume, and we'll keep it very simple, that we reported $100 in taxable income on an original return. And on our amended return, what I call the first amended return in our papers, which was filed in conjunction with amnesty, we reported an additional $50 in income and paid the additional tax. Well, what also could have happened is we could have been wrong and understated what we thought the change was going to be. And if the Internal Revenue Service had come along and had assessed, let's say, or determined that our federal taxable income was $200, we would have owed additional tax on the difference between the $150 and the $200, and we would have been required to pay double interest and penalties on that additional amount. But in this case, you paid the additional, and the net effect is you didn't get whacked with a 200%. Correct. You actually broke even. Which was the purpose of the program. So you still got a benefit, and you're saying you're entitled to something more, but you're not, really, under the rule. I think the rule's... You'd be paying, you would have paid double on the difference between $106 and $130, so that's $48 that you not paid, but this time you paid $41. In effect, you broke even. I would disagree with all due respect. I understand. Breaking even here is not what this is all about. So is your position, Mr. Marcus, that because L only arises, subsection L only arises when there's an audit going on, but there's an anticipation built into that, that there is a good possibility that there will be increased tax due following the audit, and that as a result of that, the section has to, the subsection has to be read as the final sentence of that, which you quoted, applies to determinations of excess good faith payments over and above what the final determination of the IRS or federal court is. Yes. That would be correct. Because, again, taxpayers were, in order to avoid the imposition of double interest and penalty on whatever the additional income was determined by the Internal Revenue Service that was required to be reported to the state of Illinois, they were encouraged, by this rule, I would suggest, they were encouraged to overestimate the federal change that they expected. Taxpayers know that there's going to be an adjustment to their federal taxable income. It's usually not a surprise. So what this taxpayer and what other taxpayers may have attempted to do, what this taxpayer attempted to do was to overestimate its federal taxable income as finally determined by the Internal Revenue Service. To make sure that there's no double penalty. Correct. And, again, in light of the rule at 521.105.L, it was anticipated that once the federal change was finalized, which is what occurred here, that they would file in connection with the reporting requirements under 506.B of the Illinois Income Tax Act, which requires you to file the final federal change within 120 days, which the Administrative Law Judge concedes that they did. And you have two years in which to file your refund claim. And the Administrative Law Judge concedes that the refund claim, which was the amended return filed pursuant to 506.B, was timely filed. So the whole issue here is, I think you're suggesting, is whether or not this limitation applies. That's really, I think, the bottom line here. And what about the timeliness issue? I would suggest that the department and the state... The counsel for the state talks about the fact that you basically had a 90-day period of time in which that would have been satisfied. I would say that that's not even relevant to this particular case, because the way that the statute is structured, we have two separate paths, depending on whether we're talking about an assessment or a refund claim as either a result of an Illinois audit or a claim that's being filed by the taxpayer, which is unrelated to a federal change. And that's 9-11-A, which is the three years from the date the return is filed or one year from the date of payment of the tax. So that's the period you're talking about, Justice Epstein. The department is suggesting that we could have filed within the allotted time, but I'm suggesting that that's not a requirement. The requirement was that we report within 120 days of the finalization of the federal change, which is what we did, and then when we're dealing with a federal change, it's 9-11-B that applies to claims for refund that are attributable to federal changes. Now, what the ALJ says and what the director confirmed was, again, we timely filed our refund claim. But they're saying we're not entitled to actually receive the refund we're requesting because the limitation in 9-11-B blocks that refund. Now, what that limitation is really designed to do, states have two approaches to federal changes. Some states would suggest, and this is by statute, that when there's a federal change, the entire return is opened. So not only can the state assess additional tax with respect to the additional federal taxable income that's found to exist through the Internal Revenue Service's audit, but what can also happen is that the Department of Revenue in a state that follows this pattern can go into the return as originally filed, even though, let's say, the three-year statute has run, and they can reopen that return and make any other adjustments that they want. In the state of Illinois, on the other hand, what this limitation is designed to do is merely limit the additional tax that can be assessed to the amount of additional tax attributable to the federal change. The Illinois Department of Revenue cannot go back into a return where a statute has already run, where the three-year statute has already run, and make adjustments to that return other than the adjustment that would be required by the federal change, and they can only assess the additional tax attributable to the additional federal taxable income. And I might add, they have two years in which to do that. So the statute of limitations with respect to federal changes is on equal footing. Assessment, two years. Refund claim, two years. And again, it brings us to the limitation that is set forth in the emergency rules at 521-105. Now, I'm going to throw one other thing out that I initially hesitated to do, and I'm not sure how this panel will react to it. But I was involved in these regulations, in the drafting of these regulations. I was on the committee. Well, I think if that's outside the record, Mr. Marks, we need to do it. Then we'll ignore it. Yes. Okay. But I think if you go back into the administrative law judge's decision, which is affirmed by the director, you'll find that, again, he says we're outside the three-year, one-year statute of limitations that we find in 911A. But then he does say that we are timely in reporting our federal change with respect to 506B, 120 days, and then within the two years in which we're required to file the refund claim. And what the department is attempting to do here, and what I would suggest that the department is attempting to do here, is ignore the rule that it itself put into its emergency rules with respect to refunds with respect to federal changes. And what they're saying is that because what I've characterized as the first amended return in our papers, because that wasn't a return that was required to be filed, if you look at 506B, it talks in terms of final federal changes required to be filed. And what the department is arguing here is that the first federal return we filed, excuse me, the first amended return that we filed, in order to report our estimate of what we believe the federal change would be, was not required. And therefore, it can be ignored for purposes of determining the limitation in 911B. So what they're doing is they're looking at the final federal change and our original return, and as you've indicated, there's an increase in federal taxable income. There isn't a decrease. But if you go back to 521.105L, I think what the department did here, and what I would suggest that the department did here, is it said for amnesty purposes only. No other purpose. In other words, for any other purpose, you can't file an amended return that isn't a final, reporting a final change. But for amnesty purposes, we're going to allow you to file a federal return, excuse me, an Illinois amended return reporting a federal change, even though it isn't final. So we're going to allow you to do that. And by allowing you to do that, we are going to treat that change as if it was final, but only for purposes for allowing you to file a refund claim if you've overstated the federal taxable income on that amended return. And I think the rule absolutely supports that. There would be no other reason for the rule. The department's interpretation of the rule in light of the statute of limitations that's applicable to federal changes would render the rule inapplicable in every situation, and I don't think that you can do that. I mean, you have to give the rule meaning. And the only way that you can give the rule meaning is to look at it, take into account the estimate that's made on the taxpayer's first amended return, compare that to the final federal taxable income that's reported on the second amended return, and there you have the decrease in federal taxable income that generates the refund that the taxpayer is seeking here. The amnesty program invited what you're calling the first amended return. Correct. Now, according to my notes, the first return that you actually filed was in 1998 for $106 million, $107 million. In round numbers. Round numbers. Round numbers, $106 million was reported on the original return. That was your original return. That's correct. And then on 9-14-2000, you actually did file some sort of amended return, but you're not calling that your first amended return. There was an amended return that was filed prior to that, too. Actually, the same amount. Is that correct? $106 million? Approximately. Okay. That was before amnesty, though. Before the amnesty program. Correct. Under the amnesty program, you actually filed what you're calling your first amended return. That's correct. And that was for $148 million and change. Is that right? That's correct. And at that time, you also paid. $100,000 in tax. $449,994 in taxes. That would be $349,000 and change and another $100,000 in change. Correct. $349,000 was paid with the original return, and on the first amended return, there was an additional $100,000 due. So that $449,994 was paid at the invitation of the state to avoid, as Justice Epstein has said, the imposition of the 200% penalty in case you were wrong. That's correct. Okay. And then later, the federal government comes in and says, oh, wait a minute, wait a minute, it's really $130,596,080. So your actual Illinois tax liability is $305,952, is that right? I'll assume that's correct for purposes of argument. Close enough. My math might be wrong. It's the principle that's important. But it's definitely not the $449,000 that you paid when you submitted the amnesty papers. Correct. The amnesty invited papers. Correct, but I think what you have to do is you have to separate these returns when you give a consideration and look at what was paid with the original return and then look what was paid with the first amended return is the additional $100,000. Right. So the $349,324 was paid with the original return. And that is not an issue. But your actual tax liability is $305,000. I don't have that number. You're really just talking, aren't we, about how much of the additional $100,000, if any, you're entitled to get refunded. That is correct. So my point is if the state invited these through the amnesty program, which I remember they aggressively promoted, they asked for this money and they asked you to file a return and you did that all with your good faith estimate. Then they turn around and say, oh, well, you did it wrong, so too bad. That's basically what you're saying. Yes. Okay. Not that we did it wrong, but that because we overestimated, because you paid too much, but you're out of luck. You're out of luck. We get to keep the money. Correct. Right. And they're basing that on 9-11-B. The limitation of 9-11-B. And you're asking us to look at 9-11-B in conjunction with... 521-105-L. Right. Okay. I got it. Okay. You're welcome. Anything else? I have nothing. Thank you. Thank you. Ms. Wunder, do you want to start with why it's mixed questions? Yeah, I'll start with the standard of review. That's the standard that the circuit court applied, and you can conclude that that was really the best characterization of the issue. But ultimately, let me back up for a second, and whatever standard of review applies, whether it's clear error or de novo, we don't believe that that would make any difference in the outcome. And neither do they, but the point is, the issue created an issue for us that we need to resolve before we resolve the case. Well, the circuit court used clear error, and we think that that is a good characterization because, ultimately, this is best viewed as a mixed question of fact and law, because you're looking at whether facts satisfy a statutory standard. You're looking at the legal effect of a given state of fact. If that's the case, then when would you ever have a purely legal question? And I think there's a lot of shading about which things, when you're looking at facts under the lens of a statutory standard, when is that clearly erroneous and when is that just a question of statutory construction? If everyone says this is what happened, but we don't know how to interpret what happened under these statutes, isn't that purely a question of law? I think here the factual component is really intertwined with the legal question, putting it on the clear error side. Something that's more like a pure question of law is, you know, what does shall mean in a statute? Here I think you're looking at whether the fact there was an original return, there was an audit, there was a good faith estimate. Do those facts satisfy the legal standard of Section 911B for an overpayment based on a federal change? I think that this gets into questions that are close, and although it could be viewed as a question of law, the better characterization is this is applying facts to a statutory standard. It's not that different from a situation, for example, in the Belvedere case, one of the Illinois Supreme Court cases about clear error looking at whether, you know, is this a matter that involves hours, wages, and conditions of employment because that's what the statutory standard is. So here, you know, they made this estimate. They had a good faith return. Does that satisfy? Is this an overpayment of Illinois tax based on a federal change? Do those facts meet that standard? So I think it could be viewed, is best viewed as a clear error question. Ultimately, if the court views it de novo, there is still a principle that courts typically accord significant weight and deference to an agency's interpretation of the statute that it administers. We cite cases to that effect in the brief. The taxpayer has said, well, that shouldn't apply, that deference shouldn't apply in the context of a statute of limitations question, but the cases that they cite don't support that. They cite a couple of cases that don't discuss deference to agency decisions. They're statute of limitations cases, but they don't discuss deference one way or the other, and there was no need to because those cases both affirm the department's decision. So ultimately, statute of review, excuse me, standard of review, I think it's best characterized as clear error and that it shouldn't make any difference to the outcome and that the director's interpretation of the statute should be given some deference regardless. May I ask you about section L? Yes. My reading of what your argument is, and please correct me if I'm misinterpreting it, is that once the taxpayer accepts the invitation to voluntarily avail itself of the amnesty program, it is required, of course, to pay in the good faith estimate of what the taxes are. And under your reading, it appears to me that unless serendipitously they hit on the exact number of tax due in that, either way they lose because if they underestimate the amount of tax that is due, the amount of their underpayment is then assessed double penalty. If they overestimate the amount that is due, then they're not entitled to seek a refund from that overpayment. If I'm wrong, please tell me where. You're wrong on the last part. They are entitled to seek a refund from the overpayment. There's no question here that they're entitled to seek refunds from overpayments. I think that's where the taxpayer is sort of muddying the issue here a bit because, of course, they can seek refunds. That's the point of the rule that we're talking about, this 105L. It allows them, in circumstances when they're under a federal audit, to seek a refund. Now, the question here is when were they required to do that? What if the audit had come four months later than it, the declared agreement or settlement had come four months later than it had in this case? How could they have satisfied that statute of limitations under those circumstances? They could have satisfied the statute of limitations by proceeding under 511C, which allows for an extension of the limitations period by a written agreement of the taxpayer and the department. What if the taxpayer said no? What if the department had said no? They're not compelled to say yes under anything I've read. They're not compelled to say yes except, but I think it's important to keep in mind, that it's a procedure that is very, very routine. Well, that's not in the record anywhere. Not in the record, but it is the case. There are lots of things that are probably really true that aren't in records in front of us, but you understand our constraints. They didn't ask for an extension in this case. I think we can agree to that. I think they've stipulated to that. One avenue to request an extension from the department. I think if the department didn't grant the extensions and that was the only avenue available to them, that might pose some type of due process question. So they can proceed by asking for an extension. Additionally, they could have sought a conditional refund within the one-year period. If everything had been said by each side during the audit, and the IRS simply had not made its determination, and the taxpayer is waiting for that determination, and that one-year period expires, aren't you really saying that the only option would have been to ask the department for an extension? There's one other option. One option is to ask the department for an extension under C. So they could proceed under C. And still under A, they could have filed a conditional refund, But they don't know whether there's going to be. But they didn't need to know the exact number. Where's that conditional refund in the regulations? That's not in the regulations. That would be creative thinking on the part of the taxpayer. There's a practice that. Because the rules that were set out in the statutes that exist don't really say this is an option for you. They don't say it's not an option either. No, a lot of things. You're arguing if it's not written it could happen, yes, but presumably people who were finding themselves in this situation would look at the statutes and would look at the regulations to say what are my options. And there's always room for creative thinking, but are we to say that if they weren't creative enough to have thought of that themselves, that somehow they're foreclosed from pursuing this in the future? I wouldn't say a lot of creativity was required to look. You only have three choices, A, B, or C. And A and C are the choices that generally apply in most circumstances. So this idea that you have to get. Unless you read everything as saying we understand this can happen. And so if you've taken advantage of this amnesty program, which we reference in subsection L, and you just don't have your answer yet, when you get your answer, you can file. And when you get your answer, there were ways of filing a timely refund when they had their answer. In this case, there was basically a 90-day window, right? In this case, there was a 90-day window. But if the determination was 120 days later, it would have been 30 days too late. Actually, they could have still proceeded under 511A by within the one year, filing a refund claim that says, in the event the IRS determines that, in the event that we are entitled to money back after the IRS audit is completed, we are requesting a refund of that amount. They didn't do that here. Their first amended return isn't a refund claim. It's saying, we owe you more money. So within that one year period, they never filed something that says- How often does the IRS, in your experience, conduct an audit when they think that the taxpayer is overpaying? How often do you expect them to initiate an audit under those circumstances? They might, well, not generally initiate. But none of that has to do with which statute of limitations is available to the taxpayer. And I'm addressing a question of what avenues did they have available to them to seek a timely refund. And one was, they could have proceeded under A because they had three months left. Even without the three months left, within that one year period, they could have filed a protective refund claim saying, if at the end of the federal audit we are owed money, we would like a refund without knowing that exact number yet. And their first amended return here doesn't count as that because it wasn't a refund claim. Nothing in that first amendment return, they have a statutory obligation to file for a refund if they want one. And nothing on that first amendment return says, we want any money back. It just says, here's more money that we owe you. Their other avenue- So basically you're saying that almost contemporaneously with filing the good faith estimate on the amended return, they have to simultaneously or almost simultaneously say, but we want that money back, or some part of it yet to be determined. Sometime within that one year period, they had to file a claim for a refund. Under A, either with the exact number because the IRS has done, or some type of protective claim saying, if we end up being owed any money as a result of the IRS final determination. That's very implicit. No, because they didn't file anything that was a refund claim. Because what you're saying here, what this rule says is, it's going to be a good faith estimate of what is determined after the IRS audit to be owed. And almost in no circumstance that I could imagine would anyone know what that number would be. So isn't there implicit in participating with this and making a good faith estimate that we may be overestimating? And if so, we'd like our money back, as L says. L, though, isn't telling you anything about timeliness and when and how they have to ask for a refund. And they have to, L doesn't excuse complying with any applicable statutes of limitations. It's implicit in L that if you participate in the program and you're in this situation of a federal audit, it's saying we're going to give an exception to our no refund rule, and we're going to allow those taxpayers to ask for a refund. But the refund still has to be timely. Actually, another regulation under that reinforces that, M, by calling attention to the fact that this isn't tolling any statute of limitations. So what you still have to look to is what statutes of limitations apply here. And they can't take advantage of 911B by the plain language of Section 911B. And there isn't anything that the Department can do about that. The Department doesn't have the authority to override the plain statutory language. And nothing in that regulation, you know, says, for example, oh, taxpayers, if your good faith estimate happens to be too high, you can seek a refund under 911B despite the statutory restrictions that would prevent that. So you still need to look to which statutes of limitations apply. And 911B, just by its plain language, doesn't fit the situation. And I can talk about that a little more. So if you don't have 911B, you're thrown back on the two statutes of limitations that would apply, that do apply in most circumstances. So there's 911C, which is this waiver provision, which is frequently used. I mean, the legislature has provided that procedure. And, you know, it's there. It's a big part of the statute of limitations scheme. So there's nothing odd about being in a situation where waivers are requested. They didn't request a waiver here. And then there's 911A, which is the one-year period. It was available to them here. And even if the federal audit had not been concluded within that one-year period, it would have been available had they filed some type of refund claim saying, when the federal audit is done, if we owe, you know, if we're entitled to money back, you know, please give us the money, a refund claim. As I say, the First Amendment return was not a refund claim because nothing on there said, we would like a refund. It just says, we owe you more money. Let's look at the statutory language of Section 911B. That's where your argument is. It's not a refund. It's an overpayment. It's not making a claim for refund. When you look at the First Amendment return, it doesn't, it just, it just, yeah, it says here. I mean, that could have been it. That could have been the end of the day. There's nothing there that says, we would like a refund down the road. It just says, we owe you more money. Pardon me? It does say it's a good-faith estimate pending an audit. It reports just as an estimate, yes. Again, it gets back to the same situation we were talking about before, which is unless you hit the nail right on the head, you're either going to be taxed for underestimating on your good-faith estimate double penalties, or you're going to be kissing goodbye to the overpayment unless you divine what you have to do to protect your statute of limitations. Well, it's the kissing goodbye part that I would differ with you on, because they were, they are allowed to seek refunds. And the divining part, I would say, there's not a lot of divining involved here, because there is a statute that sets out, here's what the alternatives are. But basically what you've argued is that in relation to C, is that certainly when there's a, I mean, your implicit argument is certainly when there's an audit going forward, we would, we the department would grant this extension. Yes. Because it would be wrong not to under these circumstances. So if that's the case, when someone is making a good-faith estimate payment based on an audit, doesn't it seem unduly harsh to say if you haven't done what we would certainly grant, because everyone knows you can't make a final determination until the IRS is finished, that you've lost the chance to get a refund? I think you have to keep in mind that the department can only act within the strictures that are placed upon it by the statute. I mean, the statute says there's this waiver procedure. It doesn't say the department can just ignore the waiver procedure if it would have granted the waiver anyway. It says taxpayers, you know, to get this extension, the taxpayer and the department have to enter into a written agreement. And that just didn't happen here. They didn't ask for an extension. And to the everlasting regret of the department, they're unable to give them their money back. This isn't a situation where the department is out to trick taxpayers. No, but I mean, realistically under these circumstances, you're saying had they said, mother, may I, in terms of the extension, you would have been certainly willing and able to give them their money back because they didn't say, mother, may I, even though you knew there was an audit going on, which is the reason this amnesty program existed in the first place, that somehow they're not entitled to their money back. I think what we're calling mother, may I in this case is tied to a pretty important legal principle, which is that the department cannot act outside. Administrative agencies are creatures that are created by the legislature and they only can act within the strictures of the legislature. They couldn't do it. They can't just say, oh, well, that was an oversight. That was a mistake. It is a mistake. But they can't excuse it. They can't give a refund that's not authorized by statute. And this perhaps doesn't change it, but I think it's important to keep in mind here that they weren't punished for participating in this program. They received the benefit of abated double interest and penalties on, well, they paid the $100,000. They wanted 43 back. They owed 57. At the end of the day, after that federal audit, they owed this additional $57,000. That's undisputed. So they would have had double interest and penalties. The point I kept making to him is they come out even. They come out better than even. Yeah, they came out six or seven to the head. So the point is they lost nothing. In other words, they hedged their bets and played all they had. I'm unclear as to why that matters when we're talking about these principles here. I look at the whole thing in the general picture and say they played every game they could. It doesn't matter to what's the applicable statute of limitations, but I think it's in the brief, for example, the taxpayer said this is prejudicial and we're being punished for participating in the program. I just think it's important to keep in mind that the program they chose to participate in, they received significant benefits from participating in the program, and they would have received more if they had filed for the refund in a timely way in accordance with the statutory options open to them. Counsel, you're saying that they could have filed for an exception and they didn't, and they didn't file for a refund in a timely manner, but I'm looking at 911A and it says in general except, which tells me that B is an exception to A, and then what would be the point of talking about a claim for a refund within two years after the date the notification was due and talking about a recomputation of the taxpayer's income, blah, blah, blah, as a result of a federal change if you didn't expect that the application for the refund was going to come within the time limits of 911B? What's the point of having 911B if it's not going to count for anything? After you get the federal figure, the IRS comes out with the dollar amount. After you get that, you have to give the state notification. 911B. What's the point? Okay, let's look at the language in 911B. 911B is looking at a situation where you need a notification of an alteration. You have to read 911B with 506B, where the notification of an alteration is required by 506B. Then you can file this refund claim, but within two years, but it limits, 911B limits the amount recoverable. It says, refund claims under this section are limited to the amount of any overpayment resulting under this act from recomputation of the taxpayer's, so any overpayment of Illinois caps that results from giving effect to the items, to the alteration required to be reported under 506B. So what is, so you need an overpayment of Illinois tax based on the alteration required to be reported under 506B. So the overpayment that you're talking about does not include the amnesty program. Correct. Where does it say that in B, except the amnesty program? Where does that language apply? It says, from recomputation of taxpayer's income, blah, blah, where does it say except if you paid under the amnesty program? I think the key word here is, it doesn't accept or not accept the amnesty program. The key word is overpayment based on alteration required to be reported. And the alteration required to be reported means a federal change that is made by the IRS to federally reported income. Okay, so the estimate was never reported to the IRS. So are you saying that this only counts if there's an, if the federal government says you owe more money than you estimated in your good faith estimate? No, I'm saying you can only get, that 911B requires an overpayment of Illinois tax based on a federal change, an actual federal change, meaning the federal, so the good faith estimate doesn't count. And so I'm asking you again, where does it say except if you overpaid because of the amnesty program? It doesn't mean to say except if you overpaid because of the amnesty program. What you don't have here is an overpayment based on a federal change. It only permits refunds in a situation where there's an overpayment of Illinois tax based on a federal change. And here it wasn't a federal change that occasioned what they claim is the overpayment is your argument. Correct. Because that is their estimate. And that was never reported to the IRS and never determined by the IRS to be their income. If you look at 506B, it talks about changes, the changes that need to be reported are changes that are, those that are in a federal income tax return. The estimate was never in a federal income tax return. It was never a number that the IRS never saw the estimate. It was never federally reported income, the estimate number that they came up with. And it was never determined by the IRS to be their federal income. And the exact plain language of 911B limits the refunds. You can only get a refund if there is an overpayment of the Illinois tax giving effect to, based on the alteration that's required to be reported under 506B. And those alterations that are required to be reported under 506B are these final federal changes. When you give effect to that final federal change, you don't have an overpayment of Illinois tax here. Because they actually owed more money after the federal audit. Just based on the federal audit, they underpaid their Illinois tax. Eventually, of course, as we know, there was an overpayment, but that was based on the good faith estimate. The reason it doesn't fit the statutory language, if I answer your question, well, there's this catch-22 that keeps bothering me. Well, I would say there is no catch-22 because it means this provision doesn't apply, 911B doesn't apply because of the statutory language. And the department can't ignore the plain statutory language. This wasn't based on a federal change. So you just go back to the other statutes of limitations that are available. A or C, I mean, those are generally the options. There are procedures that are used, there are statutes of limitations that are used all the time in many, many contexts. So this doesn't fit. There is no federal change that caused an overpayment. So you go back to A and C. With your interpretation of what the amended complaint was, or the amended return was, rather, that included the good faith estimate, with your interpretation that that wouldn't otherwise qualify, then you're really left with C, aren't you? I think C is a big contender there. How could A be satisfied if all you've done with your amended return is make your good faith estimate of what taxes do? Oh, if all you submit within a year is a good faith estimate that just says, we owe you more money. Is that your hypothetical? This is our good faith estimate of what we owe you. If you're outfiring for a speculative return, or a refund, rather, based upon the fact that they have overestimated their good faith estimate, then you really would be left only with C. Unless the serendipitous result was that there was ample time following the disposition of the audit to give you time to file. Can you state your question once more? Sure. In a situation, and this is obviously very complicated, and I want to take this moment in case I forget to commend both sides, because I think you've both done a very fine job, but if you have a situation where you, with your interpretation of the amended return, making the good faith estimate, that if you file that, and don't either have a circumstance where the IRS audit is determined within the one-year period, or a situation where you have filed for a speculative refund, based upon the supposition that your good faith estimate was an overestimate, then you really are only left with asking the department for the extension. Yes. Within that one-year period, if you don't file this protective refund claim, the other thing you can do within that one-year period is request the extension. And so what that does is basically ignores the reality of the fact that these estimates are going to be not right on the money really ever. It doesn't ignore the reality of that, because there are avenues available to get refunds when the good faith estimate is too high. C or A. Okay. C or A, because you got the answer within the year, or because you filed a protective claim within the year that says, if it turns out we owe money, we ought to refund. And we've covered the fact that that suggestion of yours really doesn't appear anywhere in any of the regulations or the statute. I would say it's a practice the department has that falls within the terms of the statutory language that require a refund to be filed. So you say that basically to protect themselves in case the department says no, if they ask for an extension under C, they should say, here is our good faith estimate, here is our money, and by the way, file a separate request for a refund, because the amount of money we've just paid you is too much. And we don't know that yet. Yeah, so you could file something that says refund that just means there's money back. Actually, that's more explicit in the 2010 regulations to eliminate possible confusion about this. Those regulations more directly tell taxpayers you can go ahead and do this. Excuse me. If you asked for a sort of preventive refund, could you just say, dear state, we're asking for our money back, but we don't know how much. Do you have to give a specific amount? I believe what they could have said. If you were asking for $50,000, you'd have to ask for literally 50,000 different amounts, $51,000, $2,000, $3,000. They wouldn't have to put in a specific amount, but they would have to ask for a refund, which they didn't do here. But do you have to put in an amount? No. Oh, it's just asking for a refund, a blanket refund. And their first amended return was not asking for a refund. It was just saying, here's a check for some more money. Nothing about that requested a refund. So the paperwork that you supply asking for a refund doesn't have a specific amount on it. They didn't ask for a refund within that one-year period. They didn't ask for a refund. No, I'm saying if you did your preventive refund scenario, as Justice Epstein has asked, on the day that you file your good faith estimate, you file the good faith estimate, you pay your money, and oh, by the way, there's a third piece of paper that says, oh, and we want a refund if we wound up paying too much. You do not have to say how much that refund is for. You don't have to put the state on notice what you're asking for, what dollar amount you're asking for. That's correct. But you have to make it clear that you are seeking a conditional refund based on the ultimate outcome of the federal audit. But that's that in any way. All right. We've done enough. Okay. Have you got any other things you wish to add? I guess just to wrap it up, there's no question of them being able to participate, and there were avenues available to request a timely refund. There's nothing in the rule that said that they could ignore the generally applicable statute of limitations. The Department could not proceed outside the plain language of Section 911B, and I guess keeping in mind that they chose to participate in this program, and they did receive a considerable benefit from the abated interest and penalties. A quick summary. Thank you. Thank you. Mr. Marcus, I hope this case doesn't end up like the one I dealt with you eight years ago. But I think this is a limited exposure, not like that one. I don't recall which case that was. Maybe you remember. It was the one to the U.S. Supreme Court. Ah, yes. And it got remanded to Al White. Yes. He says one issue was not addressed. That was the case, yes, I recall. And we've had a lot of interest in that case. Because you asked me on a subsequent case, if it comes back here, would you rule the same way? I said yes. I just remembered all of this. I thought it was humorous in light of how serious this guy is. You have a better memory than I do. Let me just comment, if I may, on a few things that my able opponent has advanced. First of all, with respect to the standard of review, the American Airlines case, which deals with a statute of limitations issue, is pretty specific. It says a statute of limitations is reviewed de novo. And it specifically says that deference is not given to the department. With respect to this question about 911A and waiver, I think it's a red herring. First of all, there is no such thing as a protective amended return in the Illinois statute. When you file an amended return, it's on form 1120X. That's an amended corporate income tax return. And it requires that you put a number on that return. So you have to seek a specific refund. You just cannot come down to the bottom of that return and fill in a number. There are three columns on that return. You start with what was originally reported. You make your adjustments. And you come up with the revised taxable income and expenses. And you come down to a tax figure. So you have to file something. And, again, there's no such thing in the statute as a protective refund claim. And I would venture to guess that if you were to file a protective refund claim and put a dollar on the return just to protect yourself, and then at some point later to try and amend that refund claim to increase it to what you thought your refund would be, the department would challenge that. They would tell you that you can't amend that return. With respect to the federal audit and this issue about waivers and returns, again, I think if you read L in conjunction with the statutes in the Illinois Income Tax Act that deal with federal changes, and that's 506B and 911B, I think that answers your question. It seems to me that 911A does not apply to a federal change. And the fact that this first amended return isn't a refund, that's a red herring also. The first amended return filed in this case was not meant to be a refund. It was meant to comply with amnesty and report this good faith estimate of what the taxpayer thought its income was going to be. It's the second amended return that is the refund claim, and I submit that that was filed in accordance with the statute. It is timely. The ALJ found that it was timely. And again, it just reflects his opinion, which is the opinion that this court reviews, looks to the limitation under 911B. And I would also suggest that that limitation has been complied with. You cannot ignore that first amended return. It was invited by the Department of Revenue. The Department says give us your best effort, estimate what you think your federal taxable income is going to be under L, and we will give you a refund if you are incorrect. And any taxpayer, any corporate taxpayer that is in the midst of a federal audit would understand that the statute of limitations that applies is in 506B and 911B. They would never look to 911A because it just doesn't apply. It applies to Illinois audits and refund claims that do not arise as a result of a federal change. And then with respect to Section M of the regulations, which says that the regular statute of limitations will apply, it does, but it depends on what you're talking about. Because if you go to Section – I've got to keep my letters straight. There's a section in the rules that deals with Illinois audits. And it basically goes – it's K, as I recall. And it basically goes through the same process. If you're under Illinois audit during the amnesty period, it invites you to estimate your expected Illinois income and report it. And it says that if you've overpaid, the department can give you a refund or a credit. The regular statute of limitations applies to that. That's 911A. If you're dealing with a federal audit, it's 911B that you have to look to. And if you look at M, it says regular statute applies. Well, of course the regular statute applies. But the regular statute, when we're dealing with a federal change, is 911B. It is not 911A. I think with that, I'll just wrap up. I'm sure you've heard enough. And thank you for your attention. You've both made very good and interesting arguments in very detail. And your briefs were very interesting. And as I said before, I don't think this is one that will go either way. Well, we certainly hope it will go our way. But we'll leave it at that. Thank you very much.